1   **WO**

2

3                IN THE UNITED STATES DISTRICT COURT

4                    FOR THE DISTRICT OF ARIZONA

5

6   State Farm Mutual Automobile Insurance )      No. CIV-02-1141-PHX-ROS
    Company,                               )      No. CIV-03-164-PHX-ROS
7                                          )
                    Plaintiff,             )      **ORDER**
8                                          )
    vs.                                    )
9                                          )
    George Mendoza, et al.                 )
10                                         )
                    Defendants.            )
11   _____)
    George Mendoza,                        )
12                                         )
                    Plaintiff,             )
13                                         )
    vs.                                    )
14                                         )
    State Farm Mutual Automobile Insurance )
15  Company, et al.,                       )
                                           )
16                  Defendants.            )
17   _____)

18        This is an action for insurance bad faith.  Pending before the Court are State Farm

19   Mutual Automobile Insurance Company's Motion for Summary Judgment and Manual

20   Hernandez and Anthony Waddell's Cross-Motion Re: Duty of Equal Consideration.  For the

21   reasons stated below, the Court denies State Farm's Motion for Summary Judgment and

22   grants Hernandez and Waddell's Cross-Motion.[1]

23                              **BACKGROUND**

24

25

26   _____

27        [1]The Court did not set oral argument because the parties submitted memoranda
     thoroughly discussing the law and evidence in support of their positions, and oral argument
28   would not have aided the Court's decision.  See Mahon v. Credit Bur. of Placer County, Inc.,
     171 F.3d 1197, 1200 (9th Cir. 1999), modified, No. 97-17298, 1999 U.S. App. LEXIS 8016.

1    Unless otherwise indicated, the following facts are undisputed or incontrovertible.
2  This case arises out of a two-car accident on U.S. 60 on November 22, 1998. Arlinda Jo
3  Fernandez was driving one of the cars – a 1977 Chrysler Cordova. (State Farm's Statement
4  of Facts ("SFSOF") ¶¶ 2-3.) Her boyfriend, Michael Cardenas ("Cardenas"), was a front-seat
5  passenger.  (Id. ¶ 3.)  Fernandez and Cardenas were nineteen and eighteen-years old,
6  respectively, at the time of the accident. (See Exh. 39 to SFSOF at 2.)

7    Fernandez lost control of the vehicle, crossed over the center line, and struck an
8  oncoming vehicle driven by Olivia Hernandez. (See SFSOF ¶ 7; Waddell and Hernandez's
9  Separate Statement of Facts ("WHSOF") ¶ 67.) Hernandez and her front-seat passenger,
10  Tina Mendoza, were killed. (See SFSOF ¶ 7.) Two passengers riding in the back seat of the
11  Hernandez vehicle, Antonio Corona and Anthony Waddell, were injured. (See id.) Cardenas
12  was also injured. (Id.)

13    Cardenas's grandfather, John Mutchler ("Mutchler"), owned the Chrysler driven by
14  Fernandez.  (Id. ¶ 2.)  Cardenas had given Fernandez permission to drive.  (Id. ¶ 2.)
15  Mutchler's Chrysler was insured by Allstate Insurance Company ("Allstate") under a policy
16  providing personal injury liability limits of $15,000.00 per person injured, and $30,000.00
17  per accident. (Id.)

18    Fernandez was also covered by her father's State Farm policy with liability limits of
19  $25,000.00 per person and $50,000.00 per accident. (Id. ¶ 3.) Under Ariz. Rev. Stat. § 28-
20  4010, the Allstate policy was the primary policy, and the State Farm policy was excess.
21  (WHSOF ¶ 72.)

22    The accident was reported to both Allstate and State Farm. (Id. ¶ 72.) State Farm
23  assigned the claim to adjustor Kathy Jackson ("Jackson"). (Id. ¶ 74.) Jackson's "21 Day
24  Report," dated December 29, 1998, notes that Fernandez was speeding and states that
25  liability rests "100% on [her] for failure to control [the] vehicle." (Exh. 9 to SFSOF.) It
26  further states: "We will work with Allstate to settle . . . ." (Id.)

27

28

1   Mendoza's survivors retained attorney Richard Oseran ("Oseran") to represent them
2   with respect to their claim for damages.  (Id. ¶ 77.)  Hernandez's survivors, along with
3   Anthony Waddell, retained attorney Richard Zawtocki ("Zawtocki").  (Id.) Antonio Corona
4   retained attorney John Penner.  (Id.)  Fernandez and her parents retained attorney Aaron
5   Kizer ("Kizer"), a family friend. (SFSOF ¶ 10.)  Kizer represented Fernandez free of charge
6   and acknowledges that he had limited experience in excess exposure and complex insurance
7   claims.  (Mendoza and Cardenas's Response to SFSOF ("MCRSOF") ¶ 4.)

8   Notwithstanding Kizer's representation letter, State Farm forwarded correspondence
9   directly to the Fernandez family on January 11, 1999, informing Fernandez that it would be
10  investigating the accident; assuring Fernandez that if she was served with a summons and
11  complaint, State Farm would hire an attorney for her; requesting Fernandez's approval for
12  State Farm to discuss the extent of liability coverage limits and to seek full and final
13  settlement of the case; and requesting confirmation from Fernandez that no other liability
14  coverage applied.  (See Exh. 2 to MCRSOF.)

15  On February 22, 1999, Oseran sent a letter to Jackson estimating his clients' damages
16  at $1,500,000.00 and demanding State Farm's policy limits. (Exh. 4 to MCRSOF.) Jackson
17  forwarded Oseran's letter to Kizer on March 9, 1999. (Exh. 10 to SFSOF).  She requested
18  Kizer's input on how Fernandez would like her to handle the claim and explained that State
19  Farm would try to obtain a release for Fernandez on any payments made, but could make no
20  guarantees. (Id.)  She also said that State Farm would hire an accident reconstruction expert
21  to review the case to see if there were any possible defenses. (Id.)  There is no dispute that
22  under the policy State Farm had sole authority, to the exclusion of its insured, to settle claims.
23  (MCRSOF ¶ 5.)

24  On March 16, 1999, attorney William Sandweg III ("Sandweg") forwarded a letter to
25  Jackson informing her that Allstate had retained him to assist it and its insureds in trying to
26  reach a global settlement and to obtain releases from all claimants. (Exh. 11 to SFSOF.) He
27  asked her to call him to discuss their "cooperation in the effort to reach a global settlement."
28

1  (Id.) Sandweg also sent a letter to Oseran, stating: Given the number of claimants and the

2  magnitude of their claims, Allstate's obligation of good faith to its insureds precludes it from

3  accepting your policy limits demand." (Id.)  He continued: "I am in the process of

4  coordinating with the State Farm adjuster and hope to be able to get each of the claimants to

5  agree to divide what I understand to be $80,000 of total liability limits." (Id.)

6        On March 18, 1999, Oseran wrote to Sandweg explaining that his client would be

7  interested in participating in a global settlement, but that he was "not certain that Michael

8  Cardenas is entitled to any of the proceeds of the two insurance policies since it appears that

9  he may have negligently entrusted his vehicle to [Fernandez], as well as assumed any risk of

10 injury to himself." (Exh. 53 to WHSOF.)  The other claimants expressed similar concerns.

11 (WHSOF ¶ 88.)

12       On March 26, 1999, Jackson and Sandweg discussed the case by telephone.  Jackson

13 sent a letter to Sandweg on March 29, 1999, confirming the conversation.  She advised: "As

14 I have indicated to you in our conversation, I would be willing to offer any assistance in

15 reaching a global settlement with all the claimants . . . ." (Exh. 12 to SFSOF.)  A few days

16 later, on April 1, 1999, Jackson forwarded Sandweg's letters to Kizer and informed him that

17 Sandweg was assisting Allstate in efforts to reach a global settlement. (Exh. 13 to SFSOF.)

18       At some point, Sandweg and Jackson agreed to tender the collective liability limits

19 of the Allstate and State Farm policies to the injured claimants in exchange for a release of

20 all claims.  At points in her deposition, Jackson testified that she was simply "cooperating"

21 with Sandweg in his efforts to reach a settlement. (Jackson Depo. Vol. 1 at 87, 90, 132.)  At

22 other points, however, she agreed that Sandweg was "authorized" to negotiate with State

23 Farm's policy limits – to "utilize State Farm's policy proceeds in order to reach the global

24 settlement." (Id. at 88, 208.)

25       Sandweg testified that he understood his relationship with State Farm as follows: "I

26 was already offering limits on behalf of their insured or co-insured, Arlinda Jo Fernandez,

27 [through the Allstate policy], and I was going to offer their [State Farm] limits as well, at

28

- 4 -

1   least tender those out there on their behalf, and also if we got to the point of doing release

2   documentation, it would include releases for State Farm and its insureds." (Exh. 11 to

3   MCRSOF.) Sandweg's colleague, John Ager, understood that State Farm was deferring to

4   his (and presumably Sandweg's) judgment on how to resolve the claims with State Farm's

5   policy proceeds. (Ager Depo. at 40, attached as Exh. 12 to MCRSOF.)

6       Jackson spoke with Sandweg again on May 7, 1999. In a letter to Kizer dated May

7   11, 1999, she recounted: "[Sandweg] has advised that all claimants are favorable in settling

8   the claim within the policy limits." (Exh. 14 to SFSOF.) She further explained that Cardenas

9   was "having problems as a result of the accident and may need to have an attorney or

10   conservator act on his behalf." (Id.) She did not mention that the other claimants objected

11   to Cardenas sharing in the proceeds. (See id.)

12       After learning of Oseran's position, Sandweg determined that there was a potential

13   conflict of interest between Fernandez and Cardenas. (See Exh. 54 to WHSOF.) Cardenas

14   had a potential claim for damages against Fernandez for his injuries. (Id.) To fully represent

15   Fernandez, Sandweg would have to ask for a release of that claim.  (Id.)

16       On July 7, 1999, Sandweg wrote to Cardenas' attorney Evan Goldstein, asking him

17   to advise Cardenas of the pros and cons of participating in a settlement. (Exh. 54 to

18   WHSOF.) Sandweg observed that the claimants were restless and remarked: "My analysis

19   is that, even if he does not receive a dime of the settlement proceeds, it is clearly in his best

20   interest that the global settlement take place. If Mr. Cardenas were to refuse to participate

21   in the global settlement, I would expect it to fall apart." (Id.) Sandweg copied Jackson on

22   this letter. (See id.)

23       Sandweg arranged a global settlement conference with the claimants' attorneys for

24   September 16, 1999. (WHSOF ¶ 94.) Jackson did not attend the conference. (MCRSOF ¶

25   10.) She testified that she expected Sandweg to represent State Farm's interests at the

26   conference. (Jackson Depo. at 100, attached as Exh. 5 to MCRSOF.) Further, Kizer was

27   neither invited to nor informed of the meeting. (Id. at 120.) Jackson did not inform Sandweg

28

1  that Kizer was Fernandez's personal attorney until after the conference. (Id. at 135.) Kizer,

2  however, was aware that Allstate and State Farm were offering their combined policy limits

3  to all claimants to settle all claims against Fernandez. (SFSOF ¶ 30.) He was relying on

4  Jackson, Sandweg, and Ager to track the progress of the settlement activities. (Kizer Depo.

5  at 214, attached as Exh. 1 to MCRSOF.)

6      Sandweg met with the claimants' attorneys and offered to pay the $80,000.00

7  combined policy limits to the claimants in exchange for a release of their claims against

8  Fernandez. (SFSOF ¶ 21.) Sandweg also explained that Cardenas would have to agree to

9  release Fernandez and her family. (See id.) Counsel for the other injured parties stated that

10  they were unwilling to allow Cardenas to share in the settlement proceeds in any amount.

11  (Id. ¶ 22.) Joseph Dolan, who now represented Cardenas, stated that Cardenas would not

12  agree to waive his claim to a portion of the policy limits. (WHSOF ¶ 98.)

13      Sandweg eventually agreed that the claimants would have an opportunity to informally

14  interview Cardenas and Fernandez regarding the accident. On September 29, 1999, Jackson

15  reported to her supervisor at State Farm that Fernandez and Cardenas were being interviewed

16  and that she would follow up with Sandweg after the interviews. (WHSOF ¶ 99.)

17      On October 7, 1999, the claimants took informal statements from Cardenas and

18  Fernandez. (WHSOF ¶ 100.) Ager, Sandweg's associate, participated in the interviews. (Id.)

19  Jackson did not attend the interviews. (Jackson Depo. at 139, attached as Exh. 5 to MCSOF.)

20  She expected to get information from Sandweg. (Id.) On October 8, 1999, Oseran sent a

21  letter to attorneys Penner, Zawtocki, and Dolan, stating that the claimants maintained their

22  belief that Cardenas was partially at fault for the accident and that they would not release

23  Cardenas from liability unless he was willing to forego his claim to any portion of the policy

24  limits. (Exh. 23 to SFSOF.) The letter further stated: "If he [Cardenas] is unwilling to

25  forego his claim for damages then I do not see an alternative other than filing a lawsuit and

26  naming Michael Cardenas as a defendant." (Id.) Finally, the letter asked Dolan to inform

27  Oseran and the other claimants' attorneys about what Cardenas planned to do. (Id.)

28

On October 13, 1999, Ager sent a letter to Jackson summarizing the results of the interviews. (Exh. 58 to WHSOF.) He advised Jackson that it was unlikely that the Hernandez vehicle survivors would release their claims against Cardenas unless Cardenas agreed not to share in the insurance proceeds. (Id.) On November 5, 1999, Ager sent a letter to the claimants' attorneys inquiring about the status of the parties' settlement positions, and offering his firm's offices for another settlement conference. (See Exh. 39 to SFSOF at 4.)

On November 9, 1999, Oseran responded with a letter to Ager, copying Goldstein, Penner, Zawtocki, Dolan, and Kizer, stating that unless Allstate and State Farm were willing to pay the entire policy proceeds solely to the Hernandez vehicle passengers and survivors by November 23, 1999, his clients (the Mendoza survivors) would file a wrongful death claim naming Fernandez and Cardenas as defendants. (Exh. 26 to SFSOF.) Oseran's letter was followed by a separate demand letter from Penner, counsel for Corona, stating that Corona would be willing to enter into a global settlement "if and only if" Cardenas agreed not to share in the settlement. (Exh. 28 to SFSOF.) Ager did not forward the letters to either insurer because he believed they did not communicate any change in the position of the claimants. (SFSOF ¶ 45.) In addition, he hoped the letters would cause Cardenas to withdraw his claims. (Id.) No response was ever made while the settlement offer was pending. (WHSOF ¶ 104.)

On December 7, 1999, the Mendoza survivors filed suit against Fernandez and Cardenas in Superior Court in Pinal County. (SFSOF ¶ 46.) On January 7, 2000, Zawtocki wrote to Sandweg, copying Oseran, Dolan, Penner, Ager, and Kizer, joining in Oseran's November 9 demand on behalf of the Hernandez survivors and Waddell. (Id. ¶ 47.) There was no response to Zawtocki's letter, and the letter was not forwarded to State Farm. (Id. ¶ 48.)

At some point in January 2000, State Farm was notified that the Mendoza suit had been filed. (SFSOF ¶ 49.) It retained attorney Ron Collett to defend Fernandez, if necessary. (Id.) On January 28, 2000, Collett sent a letter to Jackson informing her that he had spoken

with both Sandweg and Kizer. (Exh. 32 to SFSOF.)  Sandweg informed Collett of the Cardenas issue, and that Allstate would be retaining counsel for Fernandez. (Id.)  Collett suggested to Kizer that Fernandez should maybe authorize payment of the combined policy limits to the occupants of the Hernandez vehicle and take her chances with Cardenas. (Id.)  Kizer suggested that perhaps the other claimants might agree to take $75,000.00, leaving $5000.00 for Cardenas. (Id.)

In February 2000, Oseran sent a letter to Dolan confirming that Dolan wanted as little as $3000.00 to settle Cardenas's claim. (Id. at 178.)  While it does not appear that Jackson received this letter, Jackson admits she never inquired as to Cardenas's demands and never asked Sandweg or Kizer to do so. (Id.)  State Farm did not take a statement from Cardenas or Fernandez. (Id. at 20, 50.)  Jackson admits that she never evaluated any of Cardenas's claims to determine the relative value of the claims or how much Cardenas could have hoped to recover. (Id. 42, 44, 167.)  As of February 7, 2000, it remained State Farm's position that it required five releases to resolve the claim. (Id. at 178.)

Further, an AHCCCS medical lien in the amount of $17,270.00 existed against any recovery obtained by Cardenas. (See Exh. 15 to MCRSOF.)  In March 1999, State Farm issued a draft in the amount of $10,000.00 to Mercy Care pursuant to the "med pay" portion of the policy. (Jackson Depo. at 88-89.)  This left a balance of $7,270.00 to be paid to Mercy Care from any monies recovered by Cardenas. (See Exh. 15 to MCRSOF; Jackson Depo. at 125-26.)  Jackson never discussed these facts with Cardenas, Dolan, Fernandez, or Kizer. (Id.)

Kizer, for his part, never requested that State Farm pay its policy limits just to the Hernandez vehicle claimants, though he received Oseran and Zawtocki's demands and though he was aware that a "sticking point" for settling the claims against Fernandez was whether Cardenas would share in the policy proceeds. (SFSOF ¶¶ 31-37).  Kizer did not want the Allstate and State Farm policy limits paid unless the insurers were in a position to obtain releases from all claimants. (Kizer Depo. at 38, attached as Exh. 3 to SFSOF.)

At the same time, State Farm did not inform Kizer of: (1) the facts or legal basis upon which the Hernandez vehicle claimants believed Cardenas was responsible for the accident; (2) what Cardenas wanted to settle his claim; (3) that any amounts Cardenas hoped to recover under the liability portion of the policy could be offset by the $10,000.00 paid out to Cardenas under the med pay portion of the policy; (4) that the claimants were getting restless since nearly a year had passed since the accident; (5) that State Farm knew that Cardenas had tested positive for cocaine, benzodiazepines and cannabis following the accident; (6) that there were funds available to Cardenas under the property damage provisions of the policy; (7) and that there was a medical lien on any proceeds Cardenas hoped to recover. (Kizer Depo. at 209, 210, 212-15.)   Kizer indicated that he would have advised Fernandez differently had he been provided with this information. (Id. at 215.)

On February 24, 2000, the Hernandez survivors and Waddell filed suit against Fernandez and Cardenas in Superior Court in Pinal County. (SFSOF ¶ 46.) Corona filed suit on May 15, 2000. (Id.) In April and May 2000, Collett and Sandweg attempted to arrange a mediation hearing with all of the claimants' attorneys. (See Exhs. 34-36 to SFSOF.) Oseran responded that he was not interested in mediation. (Exh. 36 to SFSOF.)

State Farm and Allstate filed interpleader actions to pay their policy limits into court. (SFSOF ¶¶ 53-54.) Cardenas ultimately withdrew any claim for personal injuries and accepted $ 7,500.00 from the property damage portion of the State Farm policy. (WHSOF ¶ 107; MCRSOF ¶ 29.) Ultimately, as part of a Morris agreement, Fernandez allowed default judgments to be taken against her in exchange for covenants not to execute and an assignment of all claims against State Farm and Allstate.  Judgments were entered against Fernandez in the amount of $1,500,000.00 on the Hernandez survivors' claim, $1,800,000.00 on the Mendoza survivors' claim, $100,000.00 on Corona's claim, and $80,000.00 on Waddell's claim. (WHSOF ¶ 108.)  State Farm did not authorize or consent to Fernandez entering into the agreement. (SFSOF ¶ 59.)

1   State Farm filed this action on June 19, 2002, seeking a declaratory judgment that it

2   acted reasonably and in good faith and that Fernandez breached her duty of cooperation by

3   entering into the agreement. Mendoza and the other assignees (hereinafter the "Claimants")

4   filed a complaint against State Farm in state Court in Pima County on February 26, 2003,

5   alleging breach of contract and bad faith failure to settle (breach of the duty of equal

6   consideration). That action was removed and later consolidated with State Farm's declaratory

7   judgment action.   The Claimants are also litigating with Allstate in Superior Court in

8   Maricopa County.

9   On October 4, 2004, State Farm moved for summary judgment, arguing that: (1) as

10  the excess insurer it owed no duties to Fernandez under the circumstances; (2) even if it did

11  owe duties to Fernandez before she entered into the <u>Morris</u> agreement, State Farm satisfied

12  its duties by tendering its policy limits to all claimants; (3) the time-limited demands set by

13  the attorneys for the Claimants did not trigger a duty of equal consideration because they did

14  not provide State Farm with the opportunity to settle all claims; (4) even if the time-limited

15  demands triggered a duty, State Farm did not receive them; and (5) Fernandez's execution

16  of the settlement agreement breached the cooperation clause of her policy and voided any

17  applicable liability coverage.

18  The Mendoza survivors and Cardenas responded on November 19, 2004.   The

19  Hernandez survivors and Waddell responded on February 4, 2004, and cross-moved to

20  establish that State Farm owed a duty of equal consideration to Fernandez. The Claimants

21  argue that State Farm waived the primary/excess distinction or should be estopped from

22  asserting it; voluntarily assumed a duty of equal consideration; was not required to inflexibly

23  insist on settling all claims, but rather to minimize the magnitude of possible excess

24  judgments against Fernandez by accepting reasonable settlement offers; received the time-

25  limited demands through Ager and Sandweg; had a duty to settle even absent a time-limited

26  demand; and is not entitled to rely on the policy's cooperation clause.

27                                    **DISCUSSION**

28

## I.     Jurisdiction

The Court has jurisdiction under 29 U.S.C. § 1332 (diversity jurisdiction): Claimants are Arizona residents; State Farm is incorporated under the law of Illinois with its principal place of business in Illinois; and the amount in controversy exceeds $75,000.00.

## II.     Controlling Substantive Law

A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).   Arizona courts apply the Restatement (Second) Conflict of Laws (1971) to determine the applicable law in a contract action.  Swanson v. The Image Bank, Inc., 206 Ariz. 264, 77 P.3d 439, 441 (Ariz. 2003).  Cases sounding in tort should be resolved under the law of the state having the most significant relationship to both the occurrence and the parties.  Restatement (Second) Conflict of Laws § 145(1) (1971).

Here, the parties agree that Arizona law controls.  Absent some public policy against such a stipulation or law inconsistent with the stipulation, the parties' agreement should be followed.  Twohy v. First Nat'l Bank of Chicago, 758 F.2d 1185, 1191 (7th Cir. 1985). Further, Arizona has the most significant relationship to the occurrence and the parties: the policy was issued in Arizona, and the settlement negotiations took place in Arizona.

## III.     Legal Standard

## A.     Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Also,

1  the dispute must be genuine, that is, "the evidence [must be] such that a reasonable jury could
2  return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

3       The party opposing summary judgment "may not rest upon the mere allegations or
4  denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is
5  a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v.
6  Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Brinson v. Linda Rose Joint Venture, 53
7  F.3d 1044, 1049 (9th Cir. 1995). There is no issue for trial unless there is sufficient evidence
8  favoring the non-moving party; if the evidence is merely colorable or is not significantly
9  probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50.  Because
10  "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from
11  the facts are jury functions, not those of a judge, . . . [t]he evidence of the non-movant is to
12  be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

13  **B.**    **The Duty of Equal Consideration**

14       As part of its implied duty of good faith and fair dealing, an insurer owes its insured
15  a duty of equal consideration. Farmers Ins. Exchange v. Henderson, 82 Ariz. 335, 313 P.2d
16  404, 405-08 (Ariz. 1957). Also sometimes known as the duty to settle, this doctrine imposes
17  liability for excess judgments on insurance companies that wrongly reject reasonable
18  settlement demands and thereby expose their insureds to losses above the policy limits.
19  See Kent D. Syverud, The Duty to Settle, 76 Va. L. Rev. 1113, 1116 (1990).

20       The duty of equal consideration focuses primarily on liability limits as a source of
21  conflict between insurers and insureds and seeks to neutralize the effect of those limits by
22  requiring insurers to ignore them when evaluating settlements. Id. at 1127.  Under certain
23  circumstances, an insurer's focus on its limits will cause the insurer to reject settlement
24  demands that a sole holder of the entire potential liability would accept. Id. at 1130. The
25  sole holder of potential liability, for instance, will assess its expected loss at trial by
26  comparing the demand to the entire expected judgment at trial. Id. Logically, though, an
27  economically rational insurance company will compare the demand only to the portion of the

28

1   expected judgment that falls within the liability limits, discounting the risk of a judgment

2   falling above the limits. Id.

3        As an example, assume that a defendant purchases a $125,000.00 automobile liability

4   policy and later injures a plaintiff in an accident in which the defendant was at fault. And

5   then assume further that $100,000.00 is the most likely judgment and the probability of other

6   judgments declines symmetrically as one moves away from $100,000.00 until it reaches zero

7   at both $50,000.00 and $150,000.00. The expected judgment is therefore $100,000.00.

8   Putting aside defense costs, a rational sole holder of potential liability will accept any

9   settlement demand for less than that amount and reject any demand for a greater sum. See

10  Charles Silver, A Missed Misalignment of Interests: A Comment on Syverud, The Duty to

11  Settle, 77 Va. L. Rev. 1585, 1586-89 (1991).

12       An insurance company, however, looking only at economically rational issues might

13  handle the situation differently. The insurer knows that if a jury returns a judgment for the

14  plaintiff that is larger than the policy limit, e.g., a judgment for $140,000.00, the insurer will

15  pay only $125,000.00. As a result, when assessing its expected loss at trial the insurer will

16  assign a value of $125,000.00 to all possible judgments equal or larger to that amount. This

17  reduces the insurance company's expected loss at trial to a level below the amount a sole

18  holder of liability would pay – for simplicity, assume it reduces the insurer's expected loss

19  to $90,000.00. If the plaintiff were to demand $95,000.00 to settle the case, the sole holder

20  would be inclined to accept the offer because she expects to lose $100,000.00. The insurance

21  company, whose liability is capped, would be inclined to reject the same offer because it

22  expects to lose only $90,000.00 at trial. See id.

23       This conflict of interest is remedied by requiring the insurance company to act as if

24  there were no insurance limits when evaluating a settlement proposal. See Clearwater v.

25  State Farm Mut. Auto. Ins. Co., 164 Ariz. 256, 260, 792 P.2d 719, 723 (1990) (holding that

26  test for evaluating whether an insurance company has given equal consideration to its insured

27  is "whether a prudent insurer without policy limits would have accepted the settlement

28

- 13 -

offer"). If the company breaches its duty, it will be liable for the full amount of any subsequent judgment in the case against the insured. Farmers Ins. Exchange, 82 Ariz. at 341, 313 P.2d at 408.

## II. Analysis

State Farm owed its insured, Fernandez, a duty of equal consideration as a matter of law. Whether State Farm breached that duty is a matter for the trier of fact.

### A. State Farm Owed a Duty Once Allstate Offered Its Limits

State Farm incorrectly argues that it owed no duties to Fernandez because it was the excess insurer and the primary insurer, Allstate, did not pay its policy limits until several months after Fernandez executed the Morris agreement.[2]   State Farm's duty of equal consideration arose – at the latest – once Allstate offered its policy limits at the global settlement conference.

Arizona courts have not precisely defined when an excess insurer's duty to evaluate a settlement offer arises. The Arizona Supreme Court, however, provided some guidance on the issue in Twin City Fire Insurance Co. v. Burke, 204 Ariz. 251, 256, 63 P.2d 282, 287 (Ariz. 2003). In that case, an excess insurer brought an action against a primary insurer for bad-faith failure to settle within the primary policy limit. The primary insurer sought to discover communications between the excess insurer and the counsel it had retained to evaluate the underlying action. The Arizona Supreme Court found that the communications were irrelevant because "until the primary carrier's policy limit is exhausted, the excess carrier's conduct during the course of an underlying action against the insured is generally irrelevant to a determination of the core issue of a primary carrier's good faith . . . ." Id.

Seizing upon this language, State Farm argues that the excess insurer for a claim owes no duties to the insured until the primary insurer pays its policy limits. This is not quite true.

---

[2]Both State Farm and Allstate's policies were written as primary policies. But because Allstate insured the car that Fernandez was driving and State Farm insured Fernandez as a driver, Ariz. Rev. Stat. § 28-4010(B) mandates that Allstate is the primary insurer for the loss and State Farm is the excess insurer.

1  The excess insurer has no duty to defend until the primary insurer pays its limits, absent a

2  policy provision to the contrary. See California Cas. Ins. Co. v. State Farm Mut. Auto. Ins.

3  Co., 185 Ariz. 165, 913 P.2d 505 (Ariz. Ct. App. 1996). But "[w]hen a primary insurer

4  and/or the insured with a self-insured retention is willing to contribute its limit of liability to

5  a settlement and makes that fact known to the excess insurer, the excess insurer's coverage

6  is triggered." 1 Allan D. Windt, Insurance Claims and Disputes § 5:26 (4th ed. 2001). At

7  that point, "the excess insurer must then evaluate whether the settlement value of the case

8  warrants a further contribution by it to a settlement." Id. Under these circumstances, the

9  excess insurer is "subject to the same duty to settle principles as the primary insurer." Id.

10  "The fact that the excess insurer should have no duty to defend, since the primary insurer

11  should still be providing a defense, is irrelevant." Id. An insurer's duty to defend and duty

12  to settle are separate and distinct. Id.; see also Mutual Ins. Co. of Ariz. v. Am. Cas. Co. of

13  Reading Penn., 189 Ariz. 22, 26, 938 P.2d 71, 75 (Ariz. Ct. App. 1996).

14         In diversity cases, federal courts are bound by the decisions of a state's highest court

15  when interpreting state law. Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 865

16  (9th Cir. 1996). If the state has not addressed the particular issue, a federal court must use

17  its best judgment to predict how the highest court would resolve it "using intermediate,

18  appellate court decisions, decisions from other jurisdictions, statutes, treatises, and

19  restatements as guidance." Id. (quotation omitted). There is no indication that the Arizona

20  Supreme Court would deviate from the principles discussed above. In fact, in Twin City, 204

21  Ariz. at 256; 63 P.2d at 287 (emphasis added), the court indicated its agreement by stating

22  that an excess insurer's duty to evaluate a settlement offer is triggered when (or not until) "a

23  primary insurer offers its policy limits."

24         Here, Allstate offered its policy limits at the latest at the September 16, 1999 global

25  settlement conference. State Farm's duty of equal consideration was triggered no later than

26  that date.

27  A.    State Farm Waived the Primary/Excess Distinction

28

1    Even if State Farm as an excess carrier had no duty to consider the Claimant's

2  demands until Allstate paid its limits, State Farm waived the primary/excess distinction.

3    To establish waiver there must be an intentional relinquishment of a known right or

4  conduct which would warrant an inference of intentional relinquishment. Goglia v. Bodnar,

5  156 Ariz. 12, 19, 749 P.2d 921, 928 (Ariz. Ct. App. 1987). "Waiver of a right requires a

6  clear showing of an intent to waive that right." Servs. Holding Co., Inc. v. Transamerica

7  Occidental Life Ins. Co., 180 Ariz. 198, 883 P.2d 435 (Ariz. Ct. App. 1994). "Waiver of a

8  right by conduct must be established by evidence of acts inconsistent with the intent to assert

9  a right." Goglia, 156 Ariz. at 19, 749 P.2d at 928.

10    State Farm waived its excess carrier rights. State Farm was aware by December 1998

11  that the Fernandez vehicle was insured by Allstate and that Allstate was the primary insurer.

12  Notwithstanding its position as the excess carrier, State Farm sent a letter to the Fernandez

13  family on January 11, 1999, informing Fernandez that it would be investigating the accident;

14  assuring Fernandez that if she was served with a summons and complaint, State Farm would

15  hire an attorney for her; requesting Fernandez's approval for State Farm to discuss the extent

16  of liability coverage limits and to seek a full and final settlement of the case; and requesting

17  confirmation from Fernandez that no other liability coverage applied (other than the State

18  Farm and Allstate policies). Nowhere in the letter did State Farm indicate that it was the

19  excess carrier or reserve its rights as an excess insurer. In spite of its position as the excess

20  insurer, State Farm promised to defend Fernandez and seek settlement.

21  **B.    State Farm Voluntarily Undertook the Duty to Settle**

22    Even if there was no waiver, State Farm undertook the duty to settle and was required

23  to consider any settlement offer with equal consideration for Fernandez's interests.

24    An insurer that "voluntarily undertakes an act, even when there is no legal duty to do

25  so, . . . must perform the assumed duty with due care and is liable for any lack of due care

26  in performing it." Lloyd v. State Farm Mut. Auto. Ins. Co., 176 Ariz. 247, 250, 860 P.2d

27  1300, 1303 (Ariz. Ct. App. 1992). Insurers are subject to the standard doctrine regarding

28

1   gratuitous assumption of duty set forth in section 323 of the <u>Restatement (Second) of Torts</u>

2   (1965). <u>Id.</u> That section provides that one who gratuitously assumes a duty to render

3   services to another "is subject to liability to the other for physical harm resulting from his

4   failure to exercise reasonable care to perform his undertaking, if (a) His failure to exercise

5   such care increases the risk of harm, or (b) The harm is suffered because of the other's

6   reliance upon the undertaking.' " <u>Restatement (Second) of Torts</u> § 323 (1965).

7        With knowledge that Allstate was the primary insurer, State Farm promised Fernandez

8   that it would seek full and final settlement of the case and that it would defend her in the

9   event she was served with a lawsuit.   Among other things, State Farm sent a letter to the

10  Fernandez family advising them that it would attempt to settle the case; asked Fernandez's

11  attorney, Aaron Kizer, for input on how to handle the claims and forwarded communications

12  from the Claimants' attorneys to Kizer; along with Allstate, coordinated a global settlement

13  conference; and made its policy limits available for a global settlement.  In doing so, State

14  Farm voluntarily assumed the duty to settle, and the duty to give equal consideration to its

15  insured.

16       State Farm argues that regardless of whether it assumed a duty to settle, it may not be

17  held liable for failure to discharge that duty because its alleged missteps did not increase the

18  risk of harm to Fernandez, as required by <u>Restatement</u> § 323. This argument has no merit.

19  Lawsuits were filed against Fernandez, of which State Farm was aware, and Fernandez had

20  judgment entered against her for $3,500,000.00 for claims that could have been settled within

21  State Farm and Allstate's policy limits.  Although State Farm and Allstate both refused to

22  settle with the Hernandez vehicle claimants because of Cardenas's potential claims, those

23  claims turned out to be minimal and were later withdrawn. The Court fails to discern how

24  State Farm's alleged inaction – its alleged failure to investigate and failure to accept the

25

26

27

28

- 17 -

1    Hernandez vehicle claimant's allegedly reasonable settlement offer – did not increase the risk

2    of harm to Fernandez.[3]

3         State Farm's argument that it owed no duties to Fernandez or alternatively that it may

4    not be held liable for any failure to discharge those duties because Fernandez retained Kizer

5    to give her advice is unavailing.  Fernandez had no right under the policies to settle claims

6    on her own.  That right was held by Allstate and State Farm.  More importantly, the duty of

7    good faith and fair dealing is non-delegable.  Walter v. Simmons, 169 Ariz. 229, 238 818

8    P.2d 214, 223 (Ariz. Ct. App. 1991).  Insurers cannot escape their duty of good faith and fair

9    dealing by delegating tasks to third-parties, id., and a fortiori cannot escape it by relying on

10   the actions of third parties with whom they have no contractual or principal-agent

11   relationship.

12   **C.    State Farm Had a Duty to Minimize Possible Excess Judgments**

13        State Farm argues that it had no duty to settle the claims against Fernandez because

14   it never had the opportunity to settle all claims within the policy limits.  This is an overly

15   narrow view of the duty to settle/duty of equal consideration.  When there are multiple claims

16   against an insured and the policy limits are not sufficient to settle all claims, the insurance

17   company has a duty to manage the insurance proceeds in a manner reasonably calculated to

18   protect the insured by minimizing total liability.  Depending on the facts, an insurer may be

19   held liable for either settling or not settling.

20        No Arizona case has addressed the insurer's duty to settle in cases of multiple

21   claimants.  The Court's task is to predict how the Arizona Supreme Court would define the

22   duty in these cases.  State Farm relies heavily on the Arizona Court of Appeal's decision in

23   State Farm Mut. Auto Ins. Co. v. Peaton, 168 Ariz. 184, 195-96, 812 P.2d 1002, 1013-14

24

25        [3]The Court expresses no opinion on whether State Farm in fact failed to discharge its
     duties.  As noted, that is a question for the jury.  Rather, the Court holds that State Farm had
26   a duty to give equal consideration to its insured, and that it may be held liable for failure to
     fulfill that duty.  Further, because the Court holds that State Farm either waived the
27   primary/excess distinction or voluntarily assumed a duty to settle, the Court does not address
28   the Claimants' estoppel argument.

1  (Ariz. Ct. App. 1991) for its argument that the duty of equal consideration arises only when

2  the insurer is presented with the opportunity to resolve all claims.  That lower court decision,

3  however, is not persuasive, and the Court is not obligated to follow it.  See Easyriders

4  Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1494 n.4 (9th Cir. 1996) (holding, in effect,

5  that a federal court is not obligated to follow the decisions of a state's intermediate appellate

6  court if there is convincing information, facts, or evidence that the state supreme court would

7  decide differently).

8         Peaton involved a single claim for insurance proceeds for injuries sustained by a child

9  hit by a car.  The driver was insured by a State Farm policy with liability limits of

10  $50,000.00. Peaton, 168 Ariz. at 186, 812 P.2d at 1004. The child and his parents demanded

11  the policy limits in exchange for a release of the insured.  Id.  They also requested that the

12  limits be placed in an interest-bearing account pending final resolution of the claim.  Id.

13  State Farm refused to pay the interest demand (at least initially), the settlement fell through,

14  and the insured ultimately entered into a Damron-Morris agreement.  Id.  State Farm

15  responded with a declaratory judgment action seeking a declaration that the insured breached

16  the policy's cooperation clause by entering into the agreement, and thus vitiated coverage.

17  Id. at 190, 812 P.2d at 1008. The trial court rejected State Farm's claim, holding that State

18  Farm had first breached the duty of equal consideration by failing to settle. Id. at 195-96, 812

19  P.2d at 1013-14.

20         On appeal, the Arizona Court of Appeals reversed, holding that no duty of equal

21  consideration/duty to settle arose because State Farm was faced with a demand in excess of

22  the policy limits. Id. at 96, 812 P.2d at 1014. The court began by noting that "relevant case

23  law indicates that an insurer's duty to give equal consideration to the interest of the insured

24  does not arise until a conflict of interest develops between the insurer and its insured." Id.

25  at 95, 812 P.2d at 1013. It then found that State Farm could have no conflict of interest with

26  its insured because the claimants had demanded more than the policy limits (in the form of

27

28

1  interest on these limits) and State Farm had no obligation to pay more than those limits.

2  Accordingly, it found that the duty never arose. Id.

3      Analogizing this case to Peaton, State Farm argues that it had owed no duty of equal

4  consideration to Fernandez because it was faced with demands in excess of its policy limits

5  – the demand from the Hernandez vehicle claimants for the policy limits on the one hand and

6  the demand from Cardenas for an additional amount on the other.  Although Peaton is

7  analogous, it rests on a fundamentally unsound premise: that a conflict of interest does not

8  develop when an insurer is faced with a demand for more than the policy limits.  A conflict

9  of interest between the insurance company and the insured easily develops in these situations.

10      An example would be if a defendant has a $125,000.00 automobile liability policy and

11  injures a plaintiff in an accident.  Based on the information available, the insurance company

12  and insured expect a judgment at trial in the range of $120,000.00 - $220,000.00, with

13  $170,000.00 being the most likely judgment.  If the plaintiff makes a settlement demand for

14  $150,000.00, $25,000.00 more than the limits of the policy, the incentives of the insurance

15  company and insured diverge widely.

16      The sole holder of potential liability would accept the demand because it is $20,000.00

17  less than her expected loss as trial ($170,000.00).  The insurer's incentives are different.

18  Because it is not responsible for any amount over $125,000.00, it will discount the risk of all

19  trial outcomes above this figure ($125,000.00 – $170,000.00).  Putting aside defense costs,

20  its expected loss at trial will be somewhere in between $120,000.00 (the lowest possible trial

21  outcome) and $125,000.00 (the liability limits).  Thus, the insurer will have an incentive to

22  reject the plaintiff's settlement demand in hopes of going for broke and achieving the lowest

23  possible judgment at trial while the sole holder would accept the demand because it is less

24  than her expected loss at trial, and she remains liable for any excess judgment.  See Charles

25  Silver, A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle, 77

26  Va. L. Rev. 1585, 1590-91 (1991).

27

28

1    There is a similar conflict of interest when none of the possible judgments fall within

2 the policy limits. Where the policy limit is set at $125,000.00 and the insurance company and

3 the defendant expect a judgment at trial ranging from $200,000.00 to $300,000.00, with

4 $250,000.00 being the most likely verdict, putting aside defense costs again, "the insurer will

5 be indifferent between all settlement demands above the policy limits because the insurer will

6 expect to pay the same amount – the policy limits – whether any such demand is accepted or

7 declined." Id. But this does not mean that no conflict exists. Although the sole holder of

8 potential liability would reject a demand in excess of $250,000.00 (the expected judgment),

9 "the insurer would be indifferent between a demand for $300,000 and a demand for $200,000

10 because the insurer will pay the same amount, $125,000, in either event." Id. Here again,

11 the primary danger is that the insurer might fail to minimize costs by rejecting unreasonable

12 demands. Id.

13    Thus, whether the plaintiff's demand is in excess of the policy limits or far in excess,

14 a conflict of interest can arise. Although the examples above involve single claimants, the

15 principles are the same in cases involving multiple claimants. Because the insurance

16 company's limited liability means that it shares only some of the risk of going to trial,

17 demands in excess of the policy limits will create a conflict, regardless of whether the excess

18 arises from the demand of a sole claimant or from the demands of multiple claimants. In the

19 multiple victim case, however, there is an additional dilemma – the insurance company may

20 have to decide how to divide the policy limits, and may have to decide whether to pay the full

21 limits to a single claimant.

22    This is the dilemma State Farm faced in this case, and it is a difficult one. Because

23 the insurer can settle with one claimant but not all of them, it will always face the possibility

24 of an excess judgment and accompanying charges of bad faith. Most courts have taken a

25 case-by-case approach to this situation. Depending on the facts, an insurance company may

26 be liable for an excess judgment if it unreasonably rushed to settle one claim to the exclusion

27 of others. See generally, 1 Allan D. Windt, Ins. Claims and Disputes § 5.8 (4th ed. 2001);

28

1    see also Brown v. United States Fid. & Guar. Co., 314 F.2d 675, 682 (2d Cir. 1963) (New

2    York law).  Conversely, it may be liable for an excess judgment if it unreasonably insists on

3    a global settlement, preventing settlement of any claim and subjecting the insured to liability

4    in excess of the policy limits.  Windt, supra, § 5.8; see also Liberty Mut. Ins. Co. v. Davis,

5    412 F.2d 475, 480 (5th Cir. 1969) (Florida law).

6            The first scenario – unreasonable rush to settlement – is a variation of the last

7    hypothetical discussed above. Consider the following hypothetical: An insured party carries

8    an automobile liability policy of $100,000.00 per accident and injures two victims in an

9    accident, Victim A and Victim B, both of whom file claims.  The insured expects a judgment

10   at trial of $200,000.00 on Victim A's claim and $400,000.00 on Victim B's claim. Because

11   there is no chance of a judgment below the policy limits and because the insurer is liable only

12   for those limits, the insurer is indifferent, economically speaking, to the differences between

13   Victim A's and B's claims, and may accept A's demand, even though settlement with Victim

14   B for the same amount would wipe out more excess liability for the insured.

15           The duty of equal consideration corrects this incentive imbalance by again forcing the

16   insurance company to view the claims in the same way a sole holder of potential liability

17   would.  "[T]he insurer's duty in a multiple claimants case should be to use the policy limits

18   to purchase for the insured release from as much liability as possible."  Stephen S. Ashley,

19   Bad Faith Actions: Liability and Damages § 4:19 (1997).  To this end, "[t]he insurer must

20   first investigate the claims and determine their individual expected costs, ignoring the policy

21   limits."  Id.  It "should then accept those settlement offers that provide the insured the

22   maximum relief from liability for each settlement dollar paid."  Id.  In the example above,

23   giving equal consideration to its insured, the insurance company would accept a settlement

24   offer for the policy limits from Victim B, because payment of the limits to B would eliminate

25   the most potential liability.

26           A number of courts have articulated similar guidelines.  See Peckham v. Cont'l Cas.

27   Ins. Co., 895 F.2d 830, 835 (1st Cir. 1990) ("The insurer's goal should be to try to effect

28

- 22 -

1 | settlement of all or some of the multiple claims so as to relieve its insured of so much of his

2 | liability as is reasonably possible, considering the paucity of the policy limits."); Liberty Mut.

3 | Ins. Co., 412 F.2d at 481 ("Insured defendants will want their policy funds to blot out as large

4 | a share of the potential claim as possible.  It follows that, insofar as the insureds' interest

5 | governs, the fund should not be exhausted without an attempt to settle as many claims as

6 | possible.").  "So long as it acts in good faith, the insurer is not held to standards of

7 | omniscience or perfection; it has leeway to use, and should constantly employ, its honest

8 | business judgment." Peckham, 895 F.2d at 835.

9 |      Conflicts may also arise in the second scenario – the insurance company's refusal to

10 | settle unless all claimants agree to release the insured. The following example illustrates one

11 | potential conflict.  Assume again that an insured with an automobile liability policy with a

12 | $100,000.00 per accident limit injures Victim A and Victim B in a crash.  On Victim A's

13 | claims, the insurance company and insured expect a judgment in the range of $50,000.00 –

14 | $250,000.00, with $150,000.00 being the most likely judgment.  On Victim B's claims, the

15 | insurance company and insured expect a judgment in the range of $40,000.00 – $180,000.00,

16 | with the most likely judgment being $110,000.00. Victim A makes a settlement demand for

17 | the policy limits, $100,000.00, refusing to share any of the proceeds with Victim B.  Victim

18 | B makes the same demand.  The insured would accept Victim A's demand because it wipes

19 | out the most expected liability – $150,000.00 of expected liability on Victim A's claims

20 | versus $110,000.00 of expected liability on Victim B's claims.  Not factoring in defense

21 | costs, the insurance company would reject both demands and prefer to go to trial.  It has only

22 | its policy limits to lose, $100,000.00, and it may be possible that it could achieve the lowest

23 | possible result in both cases – a judgment of $50,000.00 on Victim A's claim and a judgment

24 | of $40,000.00 on victim B's claim, for a total of $90,000.00 ($10,000.00 less than the policy

25 | limits).

26 |      By the same token, depending on the facts of the case, an insurer may fulfill its duty

27 | of equal consideration to its insured when it rejects a settlement demand for the policy limits

28 |

1  by one claimant in favor of a global settlement.  Using the same background facts as above,

2  if one first assumes that the that the insurance company and the insured expect a judgment

3  in the range of $0 – $150,000.00 on Victim A's claim, with the most likely judgment being

4  $75,000.00.  And then it is assumed that the expected judgment for B's claim ranges from $0

5  – $50,000.00 with a midpoint of $25,000.00.  If Victim A made a settlement demand for the

6  policy limits of $100,000.00, the insurer acting in the best interests of its insured would

7  rightly reject it in favor a global settlement that paid $75,000.00 to Victim A and $25,000.00

8  to Victim B.   This would be the case even if Victim A rejected the offer and won

9  $150,000.00 at trial and if Victim B rejected the offer and won nothing at trial (leaving the

10  insured with an excess judgment of $50,000.00 on Victim A's claim). Acceptance of Victim

11  A's demand would have been unreasonable, given that the expected judgment on A's claim

12  was $75,000.00.

13       The foregoing examples have been discussed to demonstrate that State Farm's blanket

14  assertion that "when an insurer faces multiple claims exceeding the policy limits it is not bad

15  faith for the insurer to decline settlement demands to pay its limits for settlement of less than

16  all [claims]" (State Farm's Reply for its Mot. for Summ. J. at 4) is simply wrong.[4]

17       Conflicts of interest can arise when an insurer faces multiple claims and the demands

18  outstrip the policy limits.  Thus, whether an insurer is liable for bad faith depends on the facts

19  of the case.  In some instances, the insurer may reasonably reject a settlement demand by one

20  claimant for the policy limits in favor of a global settlement.  In others, its insistence on a

21  global settlement may violate the duty of equal consideration.

22       The Court finds that State Farm owed a duty of equal consideration to Fernandez as

23  a matter of law.  The duty is not triggered only when the insurer is presented with an

24

25  _____

26  [4]State Farm cites a number of cases that purportedly support its position.  Many of
these cases are distinguishable and actually support the Claimant's position, and need not be
discussed here.  To the extent that others hold that an insurer can never violate the duty of
27  equal consideration when it insists on a release from all claimants, they are erroneous for the
28  reasons discussed above.

1  opportunity to settle all claims against its insured for an amount within the policy limits.

2  Rather, it is triggered whenever the insurer has the authority to settle claims on behalf of the

3  insured – in such cases, the insurer must view any settlement offers without exclusive regard

4  to its policy limits.  If it fails to do so, it may be held liable for bad-faith failure to settle.

5  **D.    The Time-Limited Demands**

6         State Farm further argues that it owed Fernandez no duty of equal consideration

7  because it never received the time-limited demands that it claims would have triggered the

8  duty.  This argument fails for two reasons: (1) State Farm owed a duty of equal consideration

9  to Fernandez even absent a settlement offer, and (2) there is a genuine issue of material fact

10  over whether Sandweg and Ager were State Farm's agents and whether State Farm therefore

11  received constructive notice of the demands.

12  **1.    State Farm's Duty Did Not Depend on a Settlement demand**

13         The duty of equal consideration is not as narrow as State Farm suggests.  There is no

14  "absolute requirement that an offer to settle be a prerequisite to insurance company 'bad

15  faith.' " Fulton v. Woodford, 26 Ariz.App. 17, 22, 545 P.2d 979, 984 (Ariz. Ct. App. 1976).

16  Rather, even without a settlement demand, an insurer must "give equal consideration to the

17  interests where there is a high potential of claimant recovery and a high probability that such

18  a recovery will exceed policy limits."  Id.

19         As the Tenth Circuit explained in Coleman v. Holecek, 542 F.2d 532, 537 (10th Cir.

20  1976):

21         "The duty to consider the interests of the insured arises not because there has
           been a settlement offer from the plaintiff but because there has been a claim
22         for damages in excess of the policy limits.  This claim creates a conflict of
           interest between the insured and the carrier which requires the carrier to give
23         equal consideration to the interests of the insured.  This means that 'the claim
           should be evaluated by the insurer without looking to the policy limits and as
24         though it alone would be responsible for the payment of any judgment
           rendered on the claim.'  When the carrier's duty is measured against this
25         standard, it becomes apparent that they duty to settle does not hinge on the
           existence of a settlement offer from the plaintiff.  Rather, the duty to settle
26         arises if the carrier would initiate settlement negotiations on its own behalf
           were its potential liability is equal to that of its insured."
27
   Id.
28

                                    - 25 -

1    In this case, it is undisputed that there were claims for damages in excess of the policy

2    limits.  Further, State Farm admits in its Reply/Response that there was a high potential of

3    recovery by the Claimants and an equally high probability that such a recovery would exceed

4    the available policy limits.  (State Farm's Reply for Its Mot. for Summ. J. and Resp. to

5    Hernandez-Waddell's Cross-Mot. for Summ. J. at 3.)  Regardless of whether State Farm

6    received the Hernandez vehicle claimants' offers, it owed Fernandez a duty of equal

7    consideration as matter of law.  As part of this duty, it was required to engage in settlement

8    negotiations (on its own or through an agent) and treat the interests of its insured as its own.

9    **2.    Agency**

10   Moreover, a genuine issue of material fact exists over whether Ager and Sandweg

11   were State Farm's agents for the purposes of negotiating settlement of the claims against

12   Fernandez and, thus, over whether State Farm had notice of the time-limited demands.

13   Notice to an agent constitutes notice to the principal.  Restatement (Second) of

14   Agency § 9(3) (1958).  A principal-agent relationship may be shown to exist in four ways:

15   (1) an actual express agency, shown by an express oral or written delegation of power by the

16   principal; (2) an actual agency by implication, in which an intention to create an agency is

17   inferred from the words or conduct of the parties; (3) an agency by ratification; and (4) an

18   apparent, or ostensible agency, often shown by negligent or inadvertent conduct of the

19   principal which would cause a reasonable person to infer the existence of an agency

20   relationship.  Holsclaw v. Catalina Sav. & Loan Ass'n, 13 Ariz.App. 362, 366, 476 P.2d 883,

21   887 (Ariz. Ct. App. 1971).

22   There is no evidence of an express written or oral contract of agency between State

23   Farm and Sandweg and Ager – indeed, it is undisputed that the two were retained by Allstate,

24   not State Farm.   There is, however, sufficient evidence for a jury to find an actual agency

25   by implication.  "Agency is susceptible of proof as is any other fact and may be established

26   from the circumstances, such as the relation of the parties to each other and to the subject

27   matter, their acts and conduct." Phoenix W. Holding Corp. v. Gleeson, 18 Ariz. App. 60, 65-

28

1   66, 500 P.2d 320, 325-26 (Ariz. Ct. App. 1972).  Declarations of an alleged agent, however,

2   whether oral or written, are not evidence of the act of agency or the extent thereof.  Id.

3          While State Farm's claims representative Kathy Jackson testified a number of times

4   that she was merely "cooperating" with Sandweg in his attempts to arrange a global

5   settlement, at one point during her deposition she also testified that Sandweg and Ager were

6   "authorized" to use State Farm's policy limits in negotiating a global settlement.  Further,

7   Jackson testified she did not attend the settlement conference organized by Sandweg, but

8   expected Sandweg to represent State Farm's interests at that conference.  In fact, Jackson had

9   little if any contact with the Claimants; she testified that she expected to get information from

10  Sandweg concerning settlement negotiations.  Based on Jackson's testimony, a jury may infer

11  an actual agency by implication.

12         Based on the same facts, a jury may also find an agency by ratification.  An affirmance

13  of an unauthorized transaction can be inferred from a failure to repudiate it.  Restatement

14  (Second) of Agency § 94 (1958).  Silence under circumstances where one would ordinarily

15  be expected to speak ordinarily justifies an inference of assent.  Id. cmt. c.  Whether such an

16  inference is to be drawn "is a question for the jury, unless the case is so clear that reasonable

17  [persons] could come to but one conclusion."  Id.  Here, if Sandweg and Ager were not State

18  Farm's actual agents for negotiation purposes, then a jury could infer that State Farm's failure

19  to repudiate Sandweg's representations that he had State Farm's authority to use its policy

20  limits to reach a global settlement resulted in a ratification of his actions and authority.

21         As for apparent agency, there is no support in the record for a finding of this type of

22  agency.  "Apparent authority exists where a third person reasonably believes an agent has the

23  authority of the principal."  Max of Switzerland, Inc. v. Allright Corp. of Del., 187 Ariz. 496,

24  500, 930 P.2d 1010, 1014 (Ariz. Ct. App. 1997) (quotation omitted).  Importantly, "the

25  principal must make some manifestation to the third party which could reasonably be relied

26  upon to indicate that the agent had the alleged authority."  Id. (quotation omitted).  In this

27  case, Jackson had little or no contact with the Claimants or their attorneys and there is

28

1   consequently no evidence of any manifestation to the Claimants that would give rise to

2   apparent authority.

3   **E.    Whether State Farm Breached the Duty is a Question For the Trier of Fact**

4            Whether State Farm breached the duty of equal consideration is an issue for the trier

5   of fact.  See Farinas v. Florida Farm Bureau, 850 So.2d 555, 561 (Fla. Dist. Ct. App.

6   2003) ("Whether Farm Bureau has met its good faith duty and undertaken a reasonable

7   claims settlement strategy are for a jury to decide); Flowers v. K-Mart Corp., 126 Ariz. 495,

8   497, 616 P.2d 955, 957 (Ariz. Ct. App. 1980) ("The question of whether a duty exists is one

9   for the court to decide; the question of whether such a duty has been breached is ordinarily

10  reserved for the jury to determine . . . .") (internal citation omitted).

11           "In determining whether an insurer has given consideration to the interests of the

12  insured, the test is whether a prudent insurer without policy limits would have accepted the

13  settlement offer." Clearwater, 164 Ariz. at 260, 792 P.2d at 723. In applying this test, factors

14  to be considered are: (1) the strength of the injured claimant's case on the issues of liability

15  and damages; (2) attempts by the insurer to induce the insured to contribute to settlement; (3)

16  failure of the insurer to properly investigate the circumstances so as to ascertain the evidence

17  against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) the

18  failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial

19  risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the

20  insured in inducing the insurer's rejection of the compromise offer by misleading it as to the

21  facts; and (8) any other factors tending to establish or negate bad faith on the part of the

22  insurer. Id. at 259, 792 P.2d at 722.

23           Applying these factors, a jury could reasonably find that State Farm breached its duty

24  of equal consideration by inflexibly requiring a release of all claims for payment of the policy

25  limits. There is no dispute that Fernandez faced a large excess judgment if she did not settle

26  the claims made by the Hernandez vehicle claimants within the policy. Despite the fact that

27  Cardenas had weaker claims, State Farm did not evaluate his claim; compare the relative

28

1   value of his claim to the claims made by the Hernandez vehicle claimants; look for

2   alternative ways to resolve the case, such as asking Fernandez to contribute settlement funds

3   to Cardenas; or consider other relevant factors, like the fact that Cardenas had drugs in his

4   system and that he had already been paid from the "med pay" portion of the policy and could

5   be paid from the property damage portion of the policy. State Farm in essence did nothing,

6   except to offer its policy limits in exchange for five releases.   Based on the

7   Clearwater factors, a jury could reasonably find that State Farm – in view of its policy limits

8   and limited liability – did not give equal consideration to the interests of its insured.

9       At the same time, a jury could reasonably find that State Farm met its duty of equal

10   consideration.  Although the Clearwater factors incorporate elements of negligence – by

11   asking whether the insurance company acted in a manner consistent with the way a

12   reasonable insurer would be expected to act under the circumstances – "it has long been

13   established in Arizona that negligence alone is insufficient to impose liability on an insurer

14   for the tort of bad faith." Trus Joist Corp. v. Safeco Ins. Co. of Am., 153 Ariz.95, 735 P.2d

15   125 (Ariz. Ct. App. 1987).  State Farm's failure to investigate Cardenas's liability may

16   amount to negligence, but it does not necessarily constitute a breach of the duty of equal

17   consideration. The parties agree that Fernandez's liability to the Hernandez vehicle claimants

18   was clear and that damages exceeded the policy limits.  While State Farm's policy limits

19   could give it an incentive to sit back and do nothing in such a situation, the fact that those

20   limits would be lost in any event could have equally made State Farm indifferent to (or

21   accepting of) any reasonable settlement offer.  In short, State Farm may have acted with mere

22   negligence instead of bad faith by insisting on a global settlement.  As it is traditionally, in

23   this case the issue is for a jury to decide.

24   **F.     State Farm's Cooperation Clause Defense Must Be Resolved at Trial**

25       If State Farm breached its duty of equal consideration to Fernandez, then Fernandez

26   was free to enter into a Morris agreement to protect herself from an excess judgment. Ariz.

27   Prop. & Cas. Guar. Fund v. Helme, 153 Ariz. 129, 137, 735 P.2d 451, 459 (Ariz. 1987).

28

1    **IT IS ORDERED** that State Farm's Motion for Summary Judgment [Doc. #101-1]

2    is **DENIED**.

3    **IT IS FURTHER ORDERED** that Hernandez and Waddell's Cross-Motion Re: Duty

4    of Equal Consideration [Doc. #119-1] is **GRANTED** to the extent it seeks to establish that

5    State Farm owed Fernandez a duty of equal consideration as a matter of law.

6    **IT IS FURTHER ORDERED** that the parties shall file a Joint Proposed Pretrial

7    Order, a joint stipulated Statement of the Case, a joint stipulated set of <u>voir dire</u> questions,

8    joint stipulated jury instructions, Motions in Limine, Proposed Findings of Fact and

9    Conclusions of Law, and trial memoranda of law in accordance with the deadlines and

10   instructions set forth in the Fifth Amended Rule 16 Scheduling Order.

11   **IT IS FURTHER ORDERED** setting a Final Pretrial Conference for January 26,

12   2006 at 1:30 P.M.

13

14   DATED January 5, 2006

15

16

17

18   _____
          Roslyn O. Silver
          United States District Judge

19

20

21

22

23

24

25

26

27

28

- 30 -